UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

---

M.H. and J.H. on behalf of their
minor child C.H.

Civil Action No. 8:21cv00814

Plaintiffs,

AMENDED COMPLAINT

v.

OMEGLE.COM LLC

Defendant.

Jury Trial Demanded

---

Plaintiffs M.H. and J.H., on behalf of their minor child C.H., by and through their attorneys, Hach Rose Schirripa & Cheverie LLP and Marsh Law Firm PLLC, bring this action for damages and other legal and equitable relief against Omegle.com LLC ("Omegle" or the "Company"). Plaintiffs allege as follows:

**INTRODUCTION**

1.     Defendant Omegle operates a website at https://www.omegle.com/ (hereinafter, "Omegle.com") which explicitly invites users to "Talk to strangers!"

2.     C.H. is an 11-year-old girl who used Omegle's website where she met a stranger who sexually victimized and exploited her.

3.      The abuse C.H. suffered was preventable, predictable, and only occurred because Omegle created a venue which enabled, encouraged, and enticed children to be exploited by strangers online.

4.      Omegle knowingly received value when traffic from "cappers"[1] flooded its website to commit online child exploitation.

5.      Omegle knew this was occurring and therefore enabled, encouraged, and enticed online child exploitation.

6.      Omegle's unfair and deceptive business practices have seriously impacted children across the country resulting in children being stalked, sexually assaulted, abused, and exploited by strangers.

7.      Plaintiffs bring claims under federal and state law to obtain redress.

## PARTIES

8.      Plaintiffs M.H. and J.H. reside in Morris County, New Jersey.

9.      Plaintiffs M.H. and J.H. are C.H.'s parents.

10.     C.H. was born in 2009 and all times relevant to this action was eleven years old.

---

[1] A "capper" is an individual who tricks kids into committing a sexual act over live stream while screen capturing or recording a video. *See* New Sextortion Tactics Reported to Cybertip.ca. (April 1, 2020). Retrieved May 17, 2021 from https://www.cybertip.ca/app/en/ctipalerts.

11.     Omegle failed to request verifiable parental consent to collect, disclose, or use C.H.'s personally identifiable information including C.H.'s geolocation. Neither M.H. nor J.H. ever received direct notice concerning the collection, use, and disclosure of C.H.'s data.

12.     Defendant Omegle.com LLC is a limited liability corporation registered in the State of Florida with its principal place of business located at 7901 4th Street N, Suite 300, St. Petersburg, Florida 33702.

13.     Omegle has dramatically grown in popularity since it was founded in 2009 by Leif Brooks.

14.     The Omegle website, which typically gets millions of page views per day, experienced a drastic uptick of user activity during the COVID-19 pandemic.

## JURISDICTION AND VENUE

15.     Federal subject matter jurisdiction arises out of diversity of citizenship pursuant to 28 U.S.C. § 1332, since this is a civil action where the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and is between citizens of different states.

16.     28 U.S.C. § 1367 provides supplemental jurisdiction for Plaintiffs' state law claims.

17.     Federal subject matter jurisdiction is also proper pursuant to 28 U.S.C. § 1331 because this is a civil action arising under 18 U.S.C. § 2255.

18.     Declaratory relief is proper under 28 U.S.C. §§ 2201 and 2202.

19.     Further, this Court has personal jurisdiction over the Defendant because Defendant regularly conducts business in this District and/or under the stream of commerce doctrine by causing its products and services to be disseminated in this District, including its website used by C.H.

20.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because (i) this is a civil action brought in the judicial district where the above-named Defendant resides and (ii) a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this judicial district.

## SUBSTANTIVE ALLEGATIONS

### *COPPA Prohibits the Collection of Children's Personally Identifiable Information Without Verifiable Parental Content*

21.     Recognizing the vulnerability of children in the internet age, in 1999 Congress enacted the Children's Online Privacy Act ("COPPA"). *See* 16 U.S.C. §§ 6501-6505. COPPA's express goal is to protect children's online privacy. Under COPPA, developers of child-focused apps and websites cannot lawfully obtain the personally identifiable information of children under 13 years of age without first obtaining verifiable consent from their parents.

22.     COPPA applies to any operator of a commercial website or online service that is directed to children and that: (a) collects, uses, and/or discloses personally identifiable information of children, or (b) on whose behalf such

information is collected or maintained. Under COPPA, personally identifiable information is "collected or maintained on behalf of an operator…[t]he operator benefits by allowing another person to collect personally identifiable information directly from users of" an online service. 16 C.F.R. 312.2. Further, COPPA applies to any operator of a commercial website or online service that has actual knowledge that it collects, uses, and/or discloses personally identifiable information from children.

23.     Under COPPA, "personally identifiable information" includes information such as names, email addresses, and social security numbers. COPPA's broad definition of "personally identifiable information" is as follows: "individually identifiable information about an individual collected online," which includes (1) a first and last name; (2) a physical address including street name and name of a city or town; (3) online contact information (separately defined as "an email address or any other substantially similar identifier that permits direct contact with a person online"); (4) a screen name or user name; (5) telephone number; (6) social security number; (7) a media file containing a child's image or voice; (8) geolocation information sufficient to identify street name and name of a city or town; (9) a "persistent identifier that can be used to recognize a user over time and across different Web sites or online services" (including but not limited to a customer number held in a cookie, an Internet Protocol (IP)

address, a processor or device serial number, or unique device identifier´);

and (10) any information concerning the child or the child's parents that the

operator collects then combines with an identifier.

24.    In order to lawfully collect, use, or disclose personally identifiable

information, COPPA requires that an operator meet specific requirements,

including each of the following:

> a.    Posting a privacy policy on its website or online service
>
> providing clear, understandable, and complete notice of its
>
> information practices, including what information the
>
> website operator collets from children online, how it uses
>
> such information, its disclosure practices for such
>
> information, and other specific disclosures as set forth in
>
> the Rule;
>
> b.    Providing clear, understandable, and complete notice of its
>
> information practices, including specific disclosures,
>
> directly to parents; and
>
> c.    Obtaining verifiable parental consent prior to collecting,
>
> using, and/or disclosing personally identifiable information
>
> from children.

25.    Under COPPA, "[o]btaining verifiable consent means making any

reasonable effort (taking into consideration available technology) to ensure

that before personally identifiable information is collected from a child, a parent of the child…[r]eceives notice of the operator's personally identifiable information collection, use and disclosure practices; and [a]uthorizes any collection, use, and/or disclosure of the personally identifiable information." 16 C.F.R. 312.2.

26.     The FTC recently clarified acceptable methods for obtaining verifiable parent consent, include:

    a.     Providing a form for parents to sign and return;

    b.     Requiring the use of a credit/card online payment that provides notification of each transaction;

    c.     Connecting to trained personnel via video conference;

    d.     Calling a staffed toll-free number;

    e.     Asking knowledge based questions; or

    f.     Verifying a photo-ID from the parent compared to a second photo using facial recognition technology.

### *Omegle is An Operator Under COPPA*

27.     Omegle is an "operator" pursuant to COPPA. Specifically, COPPA defines an "operator," in pertinent part, as: "any person who operates a Web site located on the Internet or an online service and who collects or maintains personally identifiable information from or about the users of or visitors to such Web site or online service, or on whose behalf such

information is collected or maintained, or offers products or services for sale

through that Web site or online service, where such Web site or online service

is operated for commercial purposes involving commerce among the several

States or with 1 or more foreign nations; in any territory of the United States

or in the District of Columbia, or between any such territory and another

such territory or any State or foreign nation; or between the District of

Columbia and any State, territory, or foreign nation." 16 C.F.R. 312.2.

28.     Defendant operated its website entirely online. Indeed, without a

connection to the internet, Plaintiff could never have accessed Omegle's

service.

29.     In 1996, Congress passed the Communications Decency Act of

1996 ("CDA of 1996") which included Section 230 ("CDA 230").[2] Congress

intended the CDA of 1996 to accomplish several things, including: (1) to

promote the free exchange of information and ideas over the internet and

(2) to encourage voluntary monitoring for offensive or obscene material.[3]

---

[2] 47 U.S.C. § 230.

[3] The CDA does not immunize an interactive computer service provider that creates or develops the content at issue. *See e-ventures Worldwide, LLC v. Google, Inc., No. 214CV646FTMPAMCM, 2017 WL 2210029, at \*3 (M.D. Fla. Feb. 8, 2017) citing Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, at 1162 (9th Cir. 2008).

### *Omegle Violated FOSTA / SESTA*

30.     In 2018, in a direct response to online platforms knowingly allowing human trafficking to occur and both promoting and profiting from it, Congress passed a bill known as Fight Online Sex Trafficking Act ("FOSTA") and Stop Enabling Sex Traffickers Act ("SESTA") (collectively, "FOSTA/SESTA"). As part of this amendment to CDA 230, Congress stated "It is the sense of Congress that –

> (1)     Section 230 of the Communications Act of 1934 (47 U.S.C. § 230; commonly known as the 'Communications Decency Act of 1996') was never intended to provide legal protection to websites that unlawfully promote and facilitate prostitution and websites that facilitate traffickers in advertising the sale of unlawful sex acts with sex trafficking victims;

> (2)     Websites that promote and facilitate prostitution have been reckless in allowing the sale of sex trafficking victims and have done nothing to prevent the trafficking of children and victims of force, fraud, and coercion; and

> (3)     Clarification of such section is warranted to ensure that such section does not provide such protection to such websites.

31.   Defendant has benefited financially and received something of value, including increased web traffic, from participation in one or more sex trafficking ventures by allowing Omegle.com to become a safe haven and a refuge for child predators, sex abusers, human traffickers, and child pornographers.

32.   Omegle.com is a focused topic of discussion by child predators and child pornographers who trade and disseminate child sexual abuse material, "capping how-tos,"[4] tips for how to create and produce child sex abuse videos on Omegle.com, advice on how to share and distribute child sex abuse material with impunity, and other perverse pursuits.

### *Omegle's Operations*

33.   Omegle is a website that enables individuals to communicate with random individuals across the world anonymously via text and video.

34.   Specifically, individuals access Omegle.com using a webcam and microphone and Omegle matches them with another stranger. Omegle pairs

---

[4] "Random girl comes on webcam to meet new people and is persuaded by random people (competing for points) to flash various body parts, not knowing that screen captures of video will surface on the world wide web within 30 seconds. The video will be traded on websites by hundreds of people and streamed. Videos are traded by collectors. Blackmailers get hold of the videos and information on the girls then hunt them and use the videos as leverage to get the girls under their control and command eg forced to do sex shows. Groups of heroes or 'white knights' who may also be pedophiles run around trying to save the girls from the blackmailing pedophiles. The Cappers and heroes fight to add the girls to their own collection." Urban Dictionary, Definition 10
https://www.urbandictionary.com/define.php?term=Capping&page=2 (visited May 17, 2021).

users randomly and in some cases Omegle matches users according to similarities in conversations and subjects.

35.     The Omegle website designates users as "You" or "Stranger 1" or "Stranger 2."

36.     To access Omegle.com, a user simply clicks on "text" or "video" under the words "start chatting." The user is then immediately placed in a chat with a stranger.

37.     Omegle.com does not require any age verification or authentication. There is nothing preventing a minor under the age of thirteen from accessing the website.

38.     Omegle.com is vulnerable to hacking. As a result, a user can grab screenshots of previous conversations and then utilize that data to obtain another user's geographic location.

***Omegle's Infamy and Synonymy with Online Child Sexual Exploitation***

39.     Since 2016, the use of Omegle's website by predators has become known to the public and to the Company itself.

40.     When vigilante activists became aware of Omegle's repeated use by child predators, they recorded videos of themselves attempting to catch these predators in the act.

41.     Further, Omegle has been mentioned in numerous criminal cases across the country after individuals were arrested for possessing and

promoting child pornography. For example, in April 2016, Ammar Butaleb was arrested in Pittsburgh, Pennsylvania after he received, viewed, and downloaded child pornography through Omegle.[5] In December 2018, Robert Alexander Kusma of in Scranton, Pennsylvania was charged with the sexual assault of a minor under sixteen years of age after first meeting and grooming a girl on Omegle.[6] In April 2019, in the state of New Jersey, twenty-four sexual predators were arrested in what was dubbed "Operation Home Alone" for using social media platforms, including Omegle, to lure children for sex.[7] In February 2020, Dalton Matthew Bates was arrested in Kentucky on thousands of counts of child pornography possession across multiple social media platforms and applications including Omegle.[8] In July 2020 in Morris County, New Jersey, Robert Murphy pleaded guilty to endangering the welfare of a child after he tried to set up an in-person meeting for sex with an eleven-year-old girl he met on Omegle.[9]

---

[5] *See* https://pittnews.com/article/106942/news/student-arrested-for-child-pornography/
[6] *See* https://www.ydr.com/story/news/crime/2018/12/18/scranton-man-accused-sexually-assaulting-york-county-girl-he-met-internet/2350851002/
[7] *See* https://www.foxnews.com/us/21-alleged-child-sexual-predators-arrested
[8] *See* https://www.themountaineagle.com/articles/band-teacher-held-in-porn-case-talked-about-temptation/
[9] *See* https://www.dailyrecord.com/story/news/2020/04/29/complaint-nj-shore-teen-drove-morris-plains-sex-girl/3047222001/

42.     Upon information and belief, Omegle has been contacted by individuals representing these exploited children or law enforcement investigating crimes committed in these cases.

43.     The countless allegations involving Omegle by those who target children for sexual abuse, pornography, and exploitation, the resulting media coverage, and the arrests and convictions of predators using Omegle.com to exploit victims indicates that Omegle has full knowledge of the extent to which its website is used to sexually target, groom, exploit, and abuse children like C.H.

44.     Omegle advertises itself as a place to "Talk to strangers!"

45.     Omegle designed Omegle.com to encourage users to "talk to strangers" and made this aspect of Omegle.com freely available and unrestricted to child users.

46.     Omegle manufactured a product which caters to child predators and receives value for the intended use of Omegle.com.

47.     Omegle manufactured a defective product that presents an unreasonable risk that child users will become victims of child exploitation and online child sex abuse.

48.     Omegle knowingly receives value for the ongoing online sexual exploitation of children on Omegle.com.

49.     Omegle knowingly receives value for the use of their product as a tool to abuse unsuspecting children on Omegle.com.

50.     The disclaimers on Omegle.com indicate that Omegle knows about the improper, illegal, and illicit use of its website, including by children.

51.     Omegle does not provide any guidance to parents who are trying to monitor their children's use of their website. The warnings on Omegle.com are nothing but boilerplate window dressing.

52.     Further, Omegle does nothing to properly verify users' ages or prevent the use of Omegle.com by minors.

53.     As a result of these failures, hundreds of thousands of minors who access Omegle.com are subject to sexual exploitation, child pornography and online abuse.

### C.H. Accesses Omegle.com and Becomes a Victim of Child Sexual Exploitation

54.     During the COVID-19 pandemic, C.H. was forced to attend school remotely and as such was provided with a Chromebook by her school.

55.     At all relevant times, Omegle knew that child predators or "cappers" used Omegle.com to exploit children to create child sex abuse material and other illicit and illegal content—including through screen-

captured videos—and that this content was later shared on Omegle and other internet platforms.

56.    At all relevant times, Omegle knowingly received value for the use of their product as a tool for child exploitation, child pornography, and child sex abuse.

57.    On or about March 31, 2020, C.H. used her Chromebook to access the Omegle.com. C.H. had never used Omegle's website before. C.H. was first paired to chat with a group of minors who appeared to be older than C.H. C.H. ended the chat with the group of minors and was placed in another chat.

58.    Upon entering the second chat, C.H. encountered a black screen. Shortly thereafter C.H. began to see text being typed on the black screen.

59.    This unknown user ("John") informed C.H. that he knew where C.H. lived and provided C.H. with her geolocation. John also told C.H. that he knew that that there were cell phones and computers in C.H.'s house which he threatened to hack.

60.    Scared and confused, C.H. pleaded with John to leave her alone.

61.    John then instructed C.H. to remove all her clothing—including her underwear—and to touch, fondle, and masturbate her naked genitals in front of the camera. C.H. pleaded with John and offered gift cards to him in lieu of complying with his demands. John became more forceful with C.H. and demanded that she remove her clothing and display her genitals.

Eventually, C.H. complied with John's demands, removed all her clothing, and touched herself sexually in accordance with the instructions she received from this stranger.

62.    John recorded C.H.'s actions, forever memorializing her child sex abuse performance.

63.    At all relevant times, Omegle knew of and collected profits, in the form of increased web traffic and advertising revenue, from fact that child predators like John—who are known to Omegle as "cappers"—took explicit screen grabs of children like C.H. and shared them online.

64.    In early 2020, "cappers" such as John flocked to Omegle to take advantage of the unprecedented increase in opportunities to engage with unsupervised children online.

65.    Immediately after this incident, C.H. notified her parents about what occurred and M.H. and J.H. reported the incident to law enforcement.

### *Omegle Engaged in the Foregoing Acts Without Obtaining Verifiable Parental Consent*

66.    Omegle enabled the collection, use, and disclosure of C.H.'s personally identifiable information and viewing C.H.'s data without notifying her parents.

67.    Omegle never obtained verifiable parental consent to collect, use, or disclose C.H.'s personally identifiable information or viewing data.

68.     C.H. never knew that her personally identifiable information and viewing data could be collected, disclosed, or used, because at all times Omegle failed to provide C.H's parents any of the required disclosures, never sought verifiable parental consent, and never provided any mechanism by which C.H's parents could provide verifiable consent.

69.     Omegle's unlawful collection for commercial gain of C.H.'s personally identifiable information and viewing information exposed C.H. and others like her to online child predators.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF 18 U.S.C. § 2255(a)**

70.     Plaintiffs repeat, re–allege, and incorporate by reference all prior and subsequent paragraphs, including paragraphs ¶¶ 1 – 65, as if fully set forth herein.

71.     18 U.S.C. § 2255, entitled "Civil Remedy for Personal Injuries," provides that any person who is a victim of a violation of 18 U.S.C. § 2252A(a)(5)(B) and who suffers personal injury as a result of such violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000 per victim, and reasonable attorney's fees.

72.     Omegle violated the federal child pornography crime found at

18 U.S.C. § 2252A(a)(5)(B) which provides that any person commits a federal

crime who:

> knowingly possesses, or knowingly accesses with intent to
> view, any […] material that contains an image of child
> pornography that has been mailed, or shipped or
> transported using any means or facility of interstate or
> foreign commerce […] or that was produced using
> materials […] affecting interstate or foreign commerce by
> any means, including by computer.

73.     C.H. suffered personal injury as a result of each of the

Defendants' violation of 18 U.S.C. § 2252A(a)(5)(B).

74.     Plaintiffs intend to prove C.H.'s actual damages as a result of

each of Omegle's conduct.

75.     At minimum, Plaintiffs intend to seek liquidated damages in the

amount of $150,000 against Omegle, as well as the cost of the action,

including reasonable attorney's fees and other litigation costs reasonably

incurred, prejudgment and post-judgment interest, and such other relief as

the Court deems appropriate.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF 18 U.S.C. §§ 1591 AND 1595

76.     Plaintiffs repeat, re–allege, and incorporate by reference all prior

and subsequent paragraphs, including paragraphs ¶¶ 1 – 72, as if fully set

forth herein.

77.    Defendant knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(1) and 1595(a) occurring within the territorial jurisdiction of the United States.

78.    Defendant's conduct was in or affected interstate and/or foreign commerce.

79.    Defendant knowingly benefited from participation in what it knew or should have known was a sex trafficking venture in violation of 18 U.S.C. §§ 1591(a)(2) and 1595(a).

80.    Defendant knowingly benefited from, and/or received value for participation in the venture in which Defendant knew C.H. would be forced to engage in commercial sexual acts while under the age of 18 years old.

81.    In an interstate and international commercial effort, Omegle knowingly recruited, enticed, harbored, obtained, advertised, maintained, patronized, and/or solicited their users to create images of commercial sex acts that C.H. was forced to engage in while she was under the age of 18 years old.

82.    Defendant's employees and/or agents had actual knowledge that they were facilitating and participating in a scheme to profit from the commercial sex acts of minor children, including C.H.

83.     Defendant knowingly benefited financially from the sex-trafficking venture and the exploitation of C.H.

84.     Defendant's conduct has caused C.H. serious harm including, without limitation, physical, psychological, financial, and reputational harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

85.     Each of the Omegle's conduct has caused C.H. serious harm including, without limitation, physical, psychological, financial, and reputational harm.

## THIRD CLAIM FOR RELIEF
## VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT 18 U.S.C. § 2710

86.     Plaintiffs repeat, re–allege, and incorporate by reference all prior and subsequent paragraphs, including paragraphs ¶¶ 1 – 82, as if fully set forth herein.

87.     Omegle is a "video tape service provider" subject to 18 U.S.C. § 2710(a)(4) of the Video Privacy Protection Act ("VPPA"). Omegle is "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale or delivery of prerecorded video cassette tapes or similar audio-visual materials" by delivering videos recorded on its website.

88.     As a user of the website, C.H. is a consumer within the definition of 18 U.S.C. § 2710(a)(1) of the VPPA.

89.     Omegle collected C.H.'s personally identifiable information ("PII") within 18 U.S.C. § 2710 (a)(3).

90.     Omegle disclosed PII to third-parties, including data brokers and advertisers, to generate revenue and profit.

91.     Omegle failed to solicit and/or obtain consent from C.H. to collect and disclose her PII, nor did Omegle provide clear and conspicuous notice of the disclosure of PII, as defined in 18 U.S.C. § 2710 (b)(2)(B).

92.     The knowing disclosures and transmission of PII violates the VPPA within the meaning of 18 U.S.C. § 2710 (b)(1).

93.     Accordingly, C.H. is entitled under 18 U.S.C. § 2710(c)(2) to an award of damages (actual, liquidated, or punitive), reasonable attorneys' fees, other litigation costs reasonably incurred, and such relief as the Court deems appropriate.

## FOURTH CLAIM FOR RELIEF
## INTRUSION UPON SECLUSION

94.     Plaintiffs repeat, re–allege, and incorporate by reference all prior and subsequent paragraphs, including paragraphs ¶¶ 1 – 90, as if fully set forth herein.

95.     C.H. has a reasonable expectation of privacy when she is online, especially while she is at her home in her private dwelling space. C.H.'s private affairs include observation of her whether by voyeurs lurking outside her window or voyeurs peering into her room through a webcam.

96.     C.H. zone of privacy extends to the surreptitious collection and tracking of her personally identifiable information and viewing data collected and aggregated by Omegle.com.

97.     The reasonableness of such expectation of privacy is violated by Omegle's unique ability to monitor C.H.'s behavior by accessing C.H.'s private devices. It is further violated by Omegle's surreptitious highly-refined tracking of its website's users through video.

98.     Omegle intentionally intruded onto and into C.H.'s solitude, seclusion, and private affairs by intentionally designing its website to allow for the surreptitious and improper monitoring, review, and/or retention of C.H.'s activities through the technologies and activities described herein.

99.     These intrusions are highly offensive to a reasonable person. This is evidenced by the legislation enacted by Congress, rules promulgated and enforcement actions undertaken by the FTC, and countless studies, op-eds, and articles describing and criticizing the online tracking of children. *See* 16 U.S.C. §§ 6501-6505. Further, the extent of the intrusion cannot be fully known since the nature of privacy invasion involves sharing C.H's personally

22

identifiable information and/or viewing data with potentially countless third-parties, known and unknown, for undisclosed and potentially unknowable purposes, in perpetuity.

100.   C.H. was harmed by the intrusion into her private affairs as detailed throughout this Complaint.

101.   Omegle's actions and conduct complained of herein were a substantial factor in causing the harm suffered by C.H.

102.   As a result of Omegle's actions, Plaintiffs seek nominal and punitive damages in an amount to be determined at trial. Plaintiffs seek punitive damages because Omegle's actions which were malicious, oppressive, and willful were calculated to injure C.H. and made in conscious disregard of her rights. Punitive damages are warranted to deter Omegle from engaging in future misconduct.

**FIFTH CLAIM FOR RELIEF**
**NEGLIGENCE**

103.   Plaintiffs repeat, re–allege, and incorporate by reference all prior and subsequent paragraphs, including paragraphs ¶¶ 1 – 98, as if fully set forth herein.

104.   Omegle owed C.H. and the general public a duty to use ordinary care in designing, maintaining, and distributing its products and services to children.

23

105.    Omegle breached that duty because, among other things, it failed to take reasonable care to address the danger of dangerous "cappers" enticed, enabled, and encouraged to sexually abuse minor children on the platforms created by Omegle to "Talk to Strangers!" Omegle's initial and continued design decisions regarding its platform are unreasonable and negligent.

106.    Omegle owed C.H. and the general public a duty of care to provide a safe online community, especially since it knew that children were and would be accessing Omegle.com.

107.    Omegle breached the duty of care by failing to implement adequate safety and security measures including monitoring its users' age and ongoing monitoring of its users' conduct while using its online service.

108.    Omegle had an ongoing, non-delegable duty to continue to monitor, supervise, inspect, and assess the use of service and application to prevent the mistreatment of its users.

109.    Omegle failed to prevent children from using its website despite its knowledge that its website was used by children; was inherently dangerous; and had been misused by sexual predators to groom and sexually abuse and exploit children.

110.    Omegle further failed to interview, assess, inspect or otherwise check on the welfare of its users to ensure that they were not being harmed,

sexually abused, or otherwise mistreated and Defendant's aforesaid failures enabled the tortious conduct experienced by C.H. to occur and continue.

111.   As a direct and proximate result of Omegle's breaches of the duty of care owed, C.H. was subjected to sexual exploitation by a stranger.

112.   Omegle's acts and omissions were committed wantonly, willfully, with reckless and/or callous disregard for the safety of its users including C.H.

113.   As a result of the above negligence on the part of the Omegle, C.H. was caused to suffer severe and painful personal injuries, emotional distress, sexual misconduct, pain, suffering, and mental anguish all of a permanent nature.

114.   By reason of the foregoing, Omegle is liable for compensatory damages and punitive damages, together with interests and costs.

## SIXTH CLAIM FOR RELIEF
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

115.   Plaintiffs repeat, re–allege, and incorporate by reference all prior and subsequent paragraphs, including paragraphs ¶¶ 1 – 106, as if fully set forth herein.

116.   Omegle engaged in reckless, extreme, and outrageous conduct by failing to take reasonable precautions to prevent children from using its website and by failing to monitor its website and use of its website to ensure

that its users were not being sexually abused, mistreated, or exploited despite knowing that children were using its website and that its website was providing a forum for sexual predators to access children.

117.    By its acts and omissions, Omegle intended to and did intentionally and recklessly cause C.H. to suffer severe emotional distress.

118.    Omegle's misconduct was so shocking and outrageous that it exceeds the reasonable bounds of decency as measured by what the average member of the community, and society as whole, would tolerate and demonstrates an utter disregard by Omegle of the consequences that followed.

119.    Omegle's misconduct was also engaged in with oppression or malice and was in conscious disregard for the rights and safety of others, including, but not limited to C.H., so as to warrant the imposition of punitive damages.

120.    As a direct and proximate result of the Omegle's conduct, a stranger gained access to C.H. and sexually exploited her. C.H. has suffered, and continues to suffer, severe emotional distress, for which she is entitled to an award of damages.

121.    Omegle knew that this reckless, extreme, and outrageous conduct would inflict severe emotional and psychological distress, including personal

physical injury as a result, including severe mental anguish, humiliation and emotional and physical distress.

122.   By reason of the foregoing, Omegle is liable for compensatory and punitive damages, together with interests and costs.

<u>SEVENTH CLAIM FOR RELIEF</u>
<u>RATIFICATION/VICARIOUS LIABILITY</u>

123.   Plaintiffs repeat, re–allege, and incorporate by reference all prior and subsequent paragraphs, including paragraphs ¶¶ 1 – 123, as if fully set forth herein.

124.   The use of the Omegle.com website for advertising, creating, posting, and sharing child sex abuse material was so pervasive and known to Omegle that it cannot be said that such conduct was so unforeseen so as to prevent the Omegle defendants from being vicariously liable for such conduct. Rather, the Omegle defendants knowingly aided and assisted the "cappers" who advertised, created, posted and shared the child sex abuse material online, and Omegle knowingly profited from that illegal activity.

125.   The Omegle defendants are vicariously liable for the conduct of the "cappers" because they ratified their conduct, knowingly received the benefits of said conduct.

126.   The Omegle defendants are further vicariously liable for the conduct of the "cappers" because they created, developed, and maintained a forum to entice, encourage and enable the sharing of such conduct.

127.   Give these circumstances, the Omegle defendants should be held vicariously liable for the actions of their "capers."

### EIGHTH CLAIM FOR RELIEF
### PUBLIC NUSIANCE

128.   Plaintiffs repeat, re–allege, and incorporate by reference all prior and subsequent paragraphs, including paragraphs ¶¶ 1 – 127, as if fully set forth herein.

129.   Omegle created and developed a public nuisance Omegle.com which violates public rights, and subverts public order, decency, and morals.

130.   Omegle's public nuisance inconveniences and damages the general public, including Plaintiff.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully requests that this Court enter a judgment in their favor against Omegle as follows:

A.   granting preliminary and permanent injunctive relief to prohibit Omegle from continuing to engage in the unlawful acts and practices described herein;

B.   awarding Plaintiffs compensatory, consequential, general, and nominal damages in an amount to be determined at trial;

C.      awarding actual damages pursuant to 18 U.S.C. § 2255(a);

D.      in the alternative to actual damages, Plaintiffs request an award of liquidated damages in the amount of $150,000 from each of Omegle's violations pursuant to 18 U.S.C. § 2255(a);

E.      awarding punitive damages in an amount sufficient to punish Omegle and to deter others from like conduct pursuant to 18 U.S.C. § 2255(a) and the common law;

F.      awarding reasonable attorney's fees pursuant to 18 U.S.C. § 2255(a);

G.      awarding pre-judgment and post-judgment interest;

H.      granting such other preliminary and equitable relief as the Court determines to be appropriate pursuant to 18 U.S.C. § 2255(a);

I.      granting any relief within the Court's jurisdiction appropriate to the proof, whether or not demanded;

J.      granting such other and further relief as the Court deems just and proper; and

K.      ordering that the Court retain jurisdiction of this matter to ensure all forms of relief it deems appropriate.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: May 17, 2021
         New York, New York

**HACH ROSE SCHIRRIPA &
CHEVERIE LLP**

By:___/s/ Hillary M. Nappi_____
Frank R. Schirripa, *pro hac vice pending*
Hillary M. Nappi, *pro hac vice*
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: (212) 213-8311
Facsimile: (212) 779-0028
fschirripa@hrsclaw.com
hnappi@hrsclaw.com

**MARSH LAW FIRM PLLC**

By:___/s/ Jennifer Freeman_____
Jennifer Freeman
Florida Bar No. 1014236
31 Hudson Yards, 11th Floor
New York, New York 10001
Telephone: (212) 372-3030
Email: jenniferfreeman@marsh.law

By:___/s/ Margaret E. Mabie_____
Margaret E. Mabie, *pro hac vice*
31 Hudson Yards, 11th Floor
New York, New York 10001
Telephone: (212) 372-3030
Email: margaretmabie@marsh.law

*Attorneys for Plaintiffs*